United States District Court
Southern District of Texas
**ENTERED**
August 02, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MELINDA PEREZ CHARLES,       §
                             §
            Plaintiff,       §
                             §
VS.                          §       CIVIL ACTION NO. 2:21-CV-00120
                             §
ANDREW SAUL,                 §
                             §
            Defendant.       §

## MEMORANDUM AND RECOMMENDATION

Plaintiff Melinda Perez Charles filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny her application for Social Security disability benefits. Now pending are Charles's and the Commissioner's construed cross-motions for summary judgment, along with Charles's reply to the Commissioner's brief. (D.E. 14, 15, 18, 21). Charles first contends that the Administrative Law Judge ("ALJ") failed to resolve a discrepancy between the vocational expert testimony given at her first hearing and the vocational expert testimony given at her remand hearing, and therefore his conclusion that she could return to her past work was not supported by substantial evidence. Second, Charles asserts that the ALJ did not apply the *de minimis* severity standard when he concluded that her migraines were not a severe impairment, and that conclusion was not supported by substantial evidence. For the reasons discussed further below, it is respectfully recommended that Charles's motion (D.E. 14) be **GRANTED**, the Commissioner's motion (D.E. 18) be **DENIED**, and the

Commissioner's denial of disability benefits be **REVERSED AND REMANDED** for further consideration.

## I.    JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Charles resides in Jim Wells County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II.    BACKGROUND & ADMINISTRATIVE RECORD

### a.  Application and Hearing

In June 2017, Charles filed an application for disability insurance benefits, alleging a disability commencing on August 14, 2014.  (D.E. 10-8 at 4-5).  Charles claimed that her hypertension, migraine headaches, osteoarthritis in her back, and umbilical hernia limited her ability to work.  (D.E. 10-9 at 25).  The Commissioner denied Charles's application both initially and on reconsideration.  (D.E. 10-5 at 36, 61).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Kim Rowlands concluded on December 15, 2017, that Charles's severe impairments included her back disorders and migraines.  (*Id.* at 31).  She concluded that Charles could stand and/or walk for six hours in an eight-hour workday.  (*Id.* at 32).  She identified Charles's past relevant work as cashier and waitress, and further concluded that Charles could still perform this work.  (*Id.* at 34).

In the Disability Determination Explanation at the reconsideration stage in March 2018, the state medical consultant concluded that Charles had several severe impairments,

including her back disorders, osteoarthritis, and dysfunction of major joints, but concluded that her migraines were non-severe.  (*Id.* at 50-51).  Dr. Judy Panek concluded that Charles could stand and/or walk for six hours in an eight-hour workday.  (*Id.* at 54).  She identified past relevant work as a bakery sales clerk and concluded that Charles could still perform this work.  (*Id.* at 59-60).

At a hearing before the ALJ on May 16, 2019, Charles testified to the following. The number one thing that bothered her and prevented her from working was headaches. (D.E. 10-3 at 41).  She had them constantly and they never went away.  (*Id.*).  She was taking Topiramate to treat the headaches, but it affected her eyesight, so she was no longer taking anything.  (*Id.* at 42).  When she had a migraine, she had to go in a dark room, take pain medication, and put a towel over her head for at least four to five hours.  Even when the worst of the pain went away, a lingering pain remained the entire day.  She experienced these headaches every day.  (*Id.*).  She could not do anything when she had a migraine.  (*Id.* at 45).  She could not drive while she had a migraine because it affected her vision.  (*Id.*). Her second biggest issue was her back, which affected her ability to both sit and stand.  (*Id.* at 45-47).  At her previous job at a bakery, she was a cashier, but that also included cleaning and lifting large trays of donuts and bread.  (*Id.* at 57).  She also had to do the mopping and cleaning.  (*Id.*).  Her time was equally distributed between working the cash register and doing other tasks.  (*Id.* at 58).

A vocational expert identified Charles's past relevant work as a composite of bakery sales clerk and cleaner, which were light work.  (*Id.* at 65).  The ALJ asked the vocational

3

expert whether a hypothetical person with the same age, education, and work experience as Charles could perform her past work if they also: (1) were limited to light work; (2) could lift up to 20 pounds occasionally and 10 pounds frequently; (3) could frequently climb ramps; (4) could never climb ladders, ropes, or scaffolds; and (5) could frequently balance, stoop, kneel, crouch, or crawl.  (*Id.* at 66).  The vocational expert testified that such a person could perform the bakery job.  If the person was also limited to understanding, remembering, and carrying out simple instructions and making simple decisions, they would be unable to do the bakery job. (*Id.*).  If the person would be absent from work at least three times a month, they would not be able to sustain any job.  (*Id.* at 66-67).  The same was true if they would be off task between 15 to 25 percent of the work day.  (*Id.* at 67).

Following the hearing, the ALJ concluded that Charles had not been under a disability since August 14, 2014. (D.E. 10-5 at 76).  However, the Appeals Council vacated the hearing decision and remanded to the ALJ for further consideration.  (*Id.* at 83-84).  In particular, the Appeals Council noted that the vocational expert identified Charles's bakery position as a composite job involving the work of a food sales clerk and cleaner, but that the ALJ had failed to do a function-by-function comparison of the RFC and Charles's reported duties at this job.  (*Id.* at 83).  Because Charles reported that the job involved eight hours of standing and walking, the Appeals Council noted that the job exceeded the definition of light work.  (*Id.*).

At the post-remand hearing before the ALJ on September 4, 2020, Charles testified to the following.  She still had a lot of headaches and became dizzy if she bent down to pick something up.  (D.E. 10-4 at 18).  She had headaches every day and they were triggered by "everything."  (*Id.* at 18-19).  She took medication, which improved the headaches and made the pain an 8 out of 10.  (*Id.* at 19).  However, it also made her drowsy.  (*Id.*).  As a result, she had to lay down 6 or 7 times day for 15 to 20 minutes.  (*Id.* at 19-20).  At her job at the bakery, she arrived in the morning and had to put up around 20 trays that weighed 10 to 15 pounds each.  (*Id.* at 27).  She also had to carry trays between the front and the kitchen, which was difficult for her feet and back.  (*Id.*).  She did this for an hour before the bakery opened, then for the remainder of the day, she was a cashier.  (*Id.* at 28).  For the final hour of the day, she again had to take the trays out and clean them to be ready for the next day.  (*Id.*).

A new vocational expert identified Charles's past relevant work at the bakery as a "bakery sales clerk."  (*Id.* at 39-40).  She stated that cleaning the trays and Charles's other additional responsibilities at the bakery would be within the normal expectations of a bakery sales clerk.  (*Id.* at 40).  The ALJ asked the vocational expert whether a hypothetical person with the same age, education, and work experience as Charles could perform her past work if they also: (1) were limited to light work; (2) could frequently climb ramps or stairs and never climb ladders, ropes, or scaffolds; (3) could frequently balance, stoop, kneel, crouch, and drawl.  (*Id.* at 40).  The vocational expert testified that such a person could perform the bakery job.  (*Id.*).  If the person had the additional limitation of frequent

5

handling and occasional fingering, that would rule out the bakery position.  (*Id.* at 40-41).
If the person were to be absent from work more than twice a month, that would also
preclude any employment.  (*Id.* at 41).  The same was true if they would be off task 25
percent of the workday or if they could only focus for 10 to 15 minutes at a time.  (*Id.* at
41-42).

   b.  *Medical Records*

   On February 18, 2014, Charles visited Dr. Roberto Diaz complaining of a headache,
among other issues.  (D.E. 10-13 at 85).  The headache began a few weeks before the
appointment, was of moderate severity, caused a sharp pain and pressure over her eyes,
made her see flashes of light, and caused nausea.  Dr. Diaz diagnosed her with a migraine,
unspecified without mention of intractable migraine and without mention of status
migrainosus, and prescribed Topamax.  (*Id.*).  Charles returned to Dr. Diaz on June 5, 2014,
and reported that she was still having migraines that were making it difficult to sleep and
causing increased visual disturbances.  (*Id.* at 81).  She also requested a different
prescription due to the side-effects caused by Topamax.  (*Id.*).  Dr. Diaz changed her
prescription to Inderal.  (*Id.* at 82).  Charles had a follow-up appointment with Dr. Diaz on
July 16, 2014, and reported mild morning headaches every day.  (*Id.* at 77).  On March 25,
2015, Charles again reported headaches.  (*Id.* at 67).

   On November 14, 2016, Charles visited the emergency room and reported that she
had the "worst headache [of her] life and [was] dizzy."  (D.E. 10-12 at 42).  She reported
that the headache was similar to a stroke she had two years earlier.  (*Id.*).  A CT scan

showed an old infarct in the left basal ganglia, but no acute brain abnormality and no significant change from a previous CT scan in December 2011. (*Id.* at 52). She was given Topamax and reported that it helped. (*Id.* at 44). She returned to the emergency room on November 18, 2016, and reported another headache, dizziness, and nausea. (*Id.* at 33).

In an undated function report,[1] Charles stated that her headaches lasted from morning to night and seemed to be getting worse, even though she had increased the amount of medication she was taking. (D.E. 10-9 at 37). She could not do anything for more than 15 minutes a day. (*Id.*). She also had trouble sleeping as a result. (*Id.* at 38). She did not cook as much as she used to because the heat triggered her headaches. (*Id.* at 39). She liked sewing but could not do it often because focusing too much on small items gave her headaches. (*Id.* at 41). She could pay attention for about 20 minutes. (*Id.* at 42). In a work history report, Charles indicated that she worked at Nortex Bakery as a cashier. (*Id.* at 106). This job included 8 hours per day of walking and standing. (*Id.*).

On July 18, 2017, Charles visited Dr. Diaz and reported that she was still getting migraines. (D.E. 10-13 at 38). He changed her prescription to Topiramate and increased the dosage. (*Id.*). On September 11, 2017, she again visited Dr. Diaz and reported that she was still having headaches and also was having double vision, mostly at the same time as the headaches. (*Id.* at 36). She also reported light and sound sensitivity, and while the increased dosage of Topiramate helped, it only did so for a little while. Dr. Diaz ordered

---

[1] This memorandum summarizes the report here because Charles likely completed it around the time she submitted her application for disability insurance benefits in June 2017.

7

an MRI of her head.  (*Id.*).  An MRI on September 13, 2017, showed an old lacunar infarct in the left basal ganglia, but no other significant abnormality.  (D.E. 10-12 at 31).  Charles followed up with Dr. Diaz on September 18, 2017, and they discussed the normal MRI results.  (D.E. 10-13 at 34).

On February 14, 2018, Charles visited Dr. Diaz and reported that she was still having headaches and that her medications were not helping.  (*Id.* at 27).  She was having trouble sleeping due to the headaches.  (*Id.*).  She did not want an increase in medication. (*Id.* at 29).  Dr. Diaz ordered another MRI.  (*Id.*).  The February 19, 2018, MRI showed: (1) a chronic insult in the left basial ganglia; and (2) chronic bilateral small vessel changes of the brain parenchyma.  (D.E. 10-14 at 17).  Dr. Diaz noted nothing acute on the MRI. (D.E. 10-13 at 25).

In a June 26, 2018, function report, Charles stated that she was always in a lot of pain due to back pain and headaches.  (D.E. 10-9 at 74).  Her headaches affected her sleep because once they started, they lasted almost all night.  (*Id.* at 75).  She could not prepare meals because the heat triggered her headaches.  (*Id.* at 76).  She rarely went outside for the same reason.  (*Id.* at 77).  Her headaches made it difficult to get along with others because she became moody.  (*Id.* at 79).

On February 22, 2019, a nurse practitioner at Dr. Diaz's office completed a treating source statement in relation to Charles's disability claim.  (D.E. 10-14 at 6).  She indicated that Charles would be off-task for 25% of a work-day due to her symptoms, could only maintain attention and concentration for less than 15 minutes, and was likely to miss more

than 4 days per month as a result of her impairments.  (*Id.*).  She could sit for 4 hours and stand for 4 hours per workday and required the option to either sit or stand at-will.  (*Id.* at 8).  Dr. Diaz also signed off on the nurse practitioner's conclusions.  (*Id.* at 9).

On May 29, 2019, Charles visited the emergency room complaining of chest pain, but also a migraine.  (D.E. 10-16 at 23).  On September 17, 2019, she again visited the emergency room complaining of a sore throat and headache.  (*Id.* at 6).

On October 21, 2019, Charles visited Dr. Diaz and reported that she had migraines daily.  (D.E. 10-18 at 14).  She stopped taking Topiramate because it affected her vision. Dr. Diaz gave her a new prescription for Butalbital.  (*Id.*).  She again visited Dr. Diaz on November 26, 2019, and reported that the migraines were still occurring.  (*Id.* at 11).  She got some relief from Fioricet, but still got migraines.  Dr. Diaz prescribed a higher dose of Propranolol.  (*Id.*).

### c.  ALJ Decision

On October 27, 2020, the ALJ issued an opinion, concluding that Charles was not under a disability since August 14, 2014.  (D.E. 10-3 at 11-27).  At the first step of the sequential evaluation process, the ALJ concluded that Charles had not engaged in substantial gainful activity since January 1, 2017, but had engaged in substantial gainful activity in 2015 and 2016.  (*Id.* at 14).  Accordingly, the ALJ considered whether Charles was disabled starting on January 1, 2017.  (*Id.*).

At the second step, the ALJ concluded that Charles had several severe impairments that limited her ability to perform basic work activities, including (1) lumbar and cervical

degenerative disc disease; (2) right knee osteoarthritis; and (3) obesity.  (*Id.*).  The ALJ noted a history of other impairments, including migraines, and recounted the medical evidence on these issues.  (*Id.* at 15-18).  As to the migraines, the ALJ concluded that the record was not entirely consistent with Charles's allegations because exams showed no acute distress or other evidence that the headaches were debilitating to the extent alleged, nor did exams show any neurological abnormalities or deficits in concentration.  (*Id.* at 18). The ALJ further stated that the record showed no treatment by a neurologist, and all MRIs were normal except for one from 2011 that showed a vascular insult in the left basal ganglia.  Accordingly, the ALJ concluded that the migraine headaches were non-severe. (*Id.*).

At the third step, the ALJ concluded that Charles did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.* at 21-22).  The ALJ concluded that Charles had the residual functional capacity ("RFC") to perform light work, except with only frequent climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, and frequent balancing, stooping, kneeling, crouching, and crawling.  (*Id.* at 22).  The ALJ stated that she considered all of Charles's medically determinable impairments, including those that were non-severe, when assessing her RFC.  (*Id.* at 15).

At step four, the ALJ concluded that, based on her RFC, Charles was able to perform her past relevant work as a bakery sales clerk, which was light work with an SVP of 3.  (*Id.* at 26).  The ALJ noted that the vocational expert on remand testified that this was not a

composite job and that a hypothetical person with Charles's RFC would be able to perform the job. (*Id.* at 26-27). The ALJ concluded that Charles could perform the job of bakery sales clerk as actually and generally performed. (*Id.* at 27). Thus, the ALJ concluded that Charles was not under a disability from August 14, 2014, to the date of the decision. (*Id.*).

The Appeals Council denied Charles's request for review of the ALJ's decision. (*Id.* at 2-4).

### III. DISCUSSION

   a. *Whether substantial evidence supported the ALJ's conclusion at Step 4 that Charles could perform her past relevant work*

In her motion for summary judgment, Charles first contends that the ALJ improperly concluded that she could perform her past relevant work. (D.E. 15 at 4). She argues that the ALJ failed to discuss or acknowledge the first vocational expert's testimony that the bakery job was a composite position, and therefore failed to resolve the discrepancy between the two vocational experts' testimony. (*Id.* at 5-6). Charles contends that the ALJ was required to at least explain why she rejected the first vocational expert's testimony. (*Id.* at 6). She argues that this error was not harmless because the job should have been classified as a composite job and because the ALJ's RFC determination still did not consider that the job required 8 hours per day of standing and walking, rather than the 6 hours per day provided for by light work. (*Id.* at 6-9). Further, she argues that if the ALJ had not found that she was able to perform her past relevant work, she likely would have been found disabled because the vocational experts testified that she had no transferrable skills. (*Id.* at 9-10).

The Commissioner responds that Charles appealed the ALJ's first denial and obtained a remand, and that the vocational expert's testimony at the remand hearing is what is relevant.  (D.E. 18 at 6-7).  The Commissioner argues that the ALJ addressed the discrepancy by asking the second vocational expert whether the job described by Charles would be a composite job, and the vocational expert responded that it was not.  (*Id.* at 7).  The Commissioner argues that both the ALJ and the second vocational expert acknowledged Charles's description of her job duties.  (*Id.* at 8).  Finally, the Commissioner contends that the ALJ found that Charles could perform the past job not only as actually performed, but also as generally performed in the national economy, which was appropriate.  (*Id.* at 8-9).

Charles does not address this claim in her reply brief.

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The burden has been described as more than a scintilla, but lower than a preponderance.  *Id.*

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental

impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

When making a decision, an ALJ must consider "all the evidence in [the] case record." 20 C.F.R. § 404.1520(a)(3). When an ALJ does not address a particular opinion, it is impossible to know whether it was overlooked or whether the ALJ properly considered and rejected it. *Kneeland v. Berryhill*, 850 F.3d 749, 762 (5th Cir. 2017).

A claimant's impairment must prevent them from doing their past relevant work. 20 C.F.R. § 404.1520(f). To determine whether a claimant can do their past relevant work, the ALJ must compare the RFC assessment with the physical and mental demands of the previous work. *Id.* In making this determination, an ALJ can consider a vocational expert's testimony regarding "the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). The vocational expert may also provide expert testimony regarding whether a hypothetical person with the same physical and mental limitations as the claimant could perform the previous work, either as the claimant actually performed it or as generally in the national economy. *Id.* § 404.1560(b)(3). "A former job performed in by the claimant may have involved functional demands and job duties

significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" SSR 82-61, 1982 WL 31387 at *2.

"Light work" requires, among other things, "a good deal of walking or standing." 20 C.F.R. § 404.1567(b). Typically, this requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *5-6.

Composite jobs do not have a DOT counterpart and cannot be evaluated "as generally performed" in the national economy. *Henry v. Colvin*, No. CIV.A. 14-1660, 2015 WL 3902731, at *3 (W.D. La. June 24, 2015) (citing the SSA's Program Operations Manual System). Further, an ALJ must consider each job within a composite job and cannot merely find a claimant capable of performing the less demanding of the two jobs. *Id.*

The occupation of "Sales Clerk, Food" involves "performing duties such as obtaining items from shelves, freezers, coolers, bins, tables, or containers," "clean[ing] shelves, bins, tables, and coolers," and "set[ting] up displays and stock[ing] shelves, coolers, counter, bins, tables, freezers, containers, or trays." *Dictionary of Occupational Titles*, No. 290.477-018. It is light work. *Id.* The occupation of "Cleaner, Housekeeping"

14

involves "clean[ing] rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories." *Dictionary of Occupational Titles*, No. 323.687-014.  It is light work.  *Id.*

Here, it is unclear whether the ALJ's conclusion that Charles could return to her previous work as a bakery sales clerk was supported by substantial evidence because the ALJ failed to address both the first vocational expert's conclusion that the job was a composite of bakery sales clerk and cleaner and Charles's own statements about the requirements of her old job.  First, as to the discrepancy between the testimony of the two vocational experts, the Commissioner has not explained why the requirement that the ALJ must consider all evidence in the record would not apply here.  *See* 20 C.F.R. § 404.1520(a)(3).  Indeed, at the beginning of the remand hearing, the ALJ explicitly stated that the prior hearing was part of the record and would be considered, stating that she would "review[] all the evidence in the file" before issuing a decision.  (D.E. 10-4 at 7).  The first vocational expert's testimony was part of this record, the ALJ did not address it in her decision or explain why she adopted the opinion of the second vocational expert instead. (D.E. 10-3 at 26-27).  Because the ALJ did not address the first vocational expert's testimony, it is impossible to know whether it was overlooked or whether the ALJ properly considered and rejected it.  *Kneeland*, 850 F.3d at 762.

While the Commissioner argues that the ALJ addressed the issue by asking the second vocational expert whether the job at the bakery was a composite job, that is not true. The ALJ asked some questions related to the job duties of a bakery sales clerk, but never

explicitly asked the second vocational expert whether the job was a composite job or asked her to resolve the discrepancy between her testimony and the first vocational expert's. (*See* D.E. 10-4 at 40). Further, the second vocational expert concluded that all of Charles's job duties were included in the "Sales Clerk, Food" listing because it included "clean[ing] shelves, bins, tables, and coolers," but Charles also testified at the first hearing that she was required to mop and do other cleaning. (D.E. 10-3 at 57; D.E. 10-4 at 40). Charles did not testify regarding those duties at the second hearing, but again, the ALJ told her beforehand that everything that happened at the first hearing was still in the record and would be considered. (D.E. 10-4 at 7).

Second, if the ALJ concludes that a claimant can do their past relevant work as generally performed in the national economy, it does not matter whether the claimant could perform the exact duties of their actual previous job. SSR 82-61, 1982 WL 31387 at *2. The ALJ made such a finding here. (D.E. 10-3 at 27). However, in order to properly reach this analysis, the ALJ was required to explain why she rejected the first vocational expert's conclusion that the bakery position was a composite job because composite jobs cannot be performed "as generally in the national economy," but rather only as actually performed by the claimant. *Henry*, 2015 WL 3902731 at *3. Accordingly, the ALJ's finding that Charles could perform the position of "Sales Clerk, Food" both as actually performed and as generally did not resolve or render harmless the discrepancy in the testimony of the two vocational experts because such a finding presupposes that the position was not a composite job.

16

Thus, in order to find harmless the ALJ's failure to address the discrepancy in vocational expert testimony, substantial evidence would have to support the ALJ's conclusion that Charles could perform her past relevant work as actually performed. However, once again, the ALJ did not address evidence in the record that is crucial to this determination.  In her RFC determination, the ALJ concluded that Charles had the capacity to perform light work.  (D.E. 10-3 at 22).  Light work typically requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251 at *5-6.  In contrast, Charles reported that the bakery job required 8 hours of standing and walking per day.  (D.E. 10-9 at 106).  This is the only evidence in the record regarding the amount of standing and walking required in the actual position Charles held.  The ALJ did not address this evidence or explain how Charles could perform the job as previously performed if it required standing for 8 hours per day, which exceeds the general requirements of light work and therefore exceeds the RFC crafted by the ALJ.

In sum, the ALJ failed to resolve the discrepancy between the two vocational experts' testimony regarding whether Charles's bakery job was a composite job.  This discrepancy needed to be resolved before the ALJ could conclude that Charles could perform the position as generally performed because, if it was a composite job, it cannot be performed "as generally."  Further, the ALJ failed to address Charles's description of the physical exertion required by the job, and therefore her finding that Charles could perform the job as actually performed was flawed.  Where, as here, the ALJ does not address evidence contrary to their conclusion, it is impossible to know whether it was

17

overlooked or whether the ALJ properly considered and rejected it. *Kneeland*, 850 F.3d at 762. Accordingly, this issue should be remanded for further consideration of the nature of Charles's previous work and the physical exertion required by the position.

> b. *Whether substantial evidence supported the ALJ's determination that Charles's migraines were not a severe impairment and that no additional limitations were necessary in the RFC determination*

Next, Charles contends that substantial evidence did not support the ALJ's conclusion that her migraines were not severe. (D.E. 15 at 10-15). She argues that the medical evidence showed that she had constant daily headaches despite medication. (*Id.* at 14). Further, she contends that her most recent MRI shows not only an issue with the left basal ganglia, but also small vessel changes of the brain parenchyma, which have been shown to be related to migraines. (*Id.*). Charles asserts that the ALJ did not dispute the existence of the migraines and was required to explain her analysis of their frequency and duration and include appropriate limitations in the RFC determination. (*Id.* at 15).

The Commissioner responds that, even if the ALJ erred in finding that Charles's migraines were not a severe impairment, that error was harmless because Charles did not provide any evidence indicating that greater limitations were required. (D.E. 18 at 9). The Commissioner notes that while Dr. Rowlands did conclude that Charles's migraines were a severe impairment, she also concluded that Charles was not disabled and could complete light work. (*Id.* at 9-10). The Commissioner contends that the ALJ's discounting of Dr. Diaz's form showing that Charles would be off-task for more than 25% of the workday was appropriate because the objective medical evidence, including Dr. Diaz's own records,

did not support that conclusion.  (*Id.* at 10-11).  The Commissioner argues that the medical evidence does not clearly support the necessity of greater restrictions due to Charles's headaches, nor has she suggested what additional restrictions are necessary.  (*Id.* at 10-13).

Charles replies that the Commissioner's briefing does not address the fact that she was prescribed various medications for migraines, or that Dr. Diaz referred Charles to a neurologist that she was not able to visit because she did not have insurance.  (D.E. 21 at 1-2).  She argues that the fact that she was not in acute distress during her medical appointments does not establish that she did not have migraines.  (*Id.* at 2).  She notes that there is objective medical evidence to support her claims of severe migraines, particularly the two MRIs.  (*Id.* at 3).  Charles reiterates that the ALJ's conclusion that her headaches did not cause even minimal impairment was clearly contrary to the record and that, regardless, even non-severe impairments must be included in the RFC determination.  (*Id.* at 3-4).

The second step of the sequential analysis requires that the factfinder decide whether the claimant's impairment is "severe," irrespective of age, education and work experience. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An impairment can only be considered as not severe if it is so slight that it would not be expected to interfere with the individual's ability to work.  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).  This standard requires the claimant to make only a *de minimis* showing. *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018).

19

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a); *Perez*, 415 F.3d at 461-62. When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 416.945(a)(3). When creating the RFC, the ALJ must consider all a claimant's medically determinable impairments, including impairments that are not severe. 20 C.F.R. § 404.1545(a)(2).

The ALJ has a duty to fully and fairly develop the facts. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). The opinions, diagnoses, and medical evidence of a treating physician should be given considerable weight in determining disability. *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). However, the ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). In determining what weight to give each medical opinion or prior administrative medical finding, the ALJ considers several factors, including consistency and supportability. *Id.*

Nonexertional limitations consider any symptoms, such as pain, that affect a claimant's ability to meet the demands of jobs other than strength demands. 20 C.F.R. § 404.1569a(c)(1). Examples of nonexertional limitations include difficulty maintaining attention or concentration and difficulty understanding or remembering detailed

instructions.  *Id.*  When evaluating the intensity and persistence of a claimant's symptoms and determining the extent to which those symptoms limit their capacity for work, an ALJ may not reject the claimant's "statements about the intensity and persistence of [their] pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2).  Because pain is subjective and difficult to quantify, an ALJ must also consider factors such as the claimant's daily activities, precipitating and aggravating factors, details about the claimant's medication and whether it is effective, and whether the claimant has received any treatment other than medication.  *Id.* § 404.1529(c)(3).  Pain can be a disabling condition when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990)).  However, where pain can be alleviated by medication, it is not disabling. *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990).

The SSA has noted that "an unremarkable MRI is consistent with a primary headache disorder diagnosis."  SSR 19-4P, 2019 WL 4169635 at *4.  While such imaging "may be useful in ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder diagnosis."  *Id.*  Factors to consider when evaluating a headache disorder include whether an acceptable medical source has diagnosed the claimant with such a disorder after reviewing the claimant's medical history, conducting a physical examination, and excluding alternative medical and psychiatric causes of the

symptoms. *Id.* at *6. Further, the claimant's response to treatment should be considered, including if headaches persist despite treatment. *Id.*

Here, the ALJ did not apply the proper *de minimis* legal standard in reaching the conclusion that Charles's migraines were not a severe impairment. The record shows that Charles complained of migraine headaches at her medical appointments for over five and a half years, from February 2014 through the latest medical records in November 2019. (*See* D.E. 10-13 at 85; D.E. 10-18 at 11). The records show at least seven changes to her medications or dosage over this time due to either problematic side-effects or ineffectiveness. (D.E. 10-12 at 44; D.E. 10-13 at 38, 82, 85; D.E. 10-18 at 11, 14). In the medical records, function reports, and her hearing testimony, Charles regularly reported that her migraines caused light and sound sensitivity, vision problems, difficulty sleeping, and difficulty concentrating. (D.E. 10-3 at 41-42, 45; D.E. 10-4 at 18-20; D.E. 10-9 at 75-77; D.E. 10-12 at 42; D.E. 10-13 at 27, 36, 81, 85; D.E. 10-18 at 14). Dr. Diaz and a nurse practitioner at his practice opined that Charles would be off-task for 25% of a work day due to her symptoms, could only maintain attention and concentration for less than 15 minutes, and was likely to miss more than 4 days per month as a result of her impairments.

(D.E. 10-14 at 6-9).[2]  Notably, in making the migraine diagnosis, Dr. Diaz was aware of

Charles's medical history, conducted physical examinations of her, and excluded

alternative causes of her symptoms by obtaining MRIs and CT scans, which the SSA has

identified as important factors to consider when evaluating a primary headache disorder

diagnosis.  (D.E. 10-12 at 31, 52; D.E. 10-14 at 17); SSR 19-4P, 2019 WL 4169635 at *6.

The ALJ provided some explanation for the conclusion that Charles's migraines

were not severe, including that her exams showed no acute distress and no neurological

abnormalities or deficits in concentration, she had not been treated by a neurologist, and

all her MRI results were essentially normal outside of a vascular insult in the left basal

ganglia that existed long before the alleged disability onset date.  (D.E. 10-3 at 18).

However, these reasons, even if accepted as correct,[3] do not support a finding that Charles's

migraines were non-severe under the applicable *de minimis* standard in light of the intensity

of symptoms consistently reported by Charles, the repeated changes to her medication due

---

[2] The ALJ later discussed these opinions during the RFC analysis, finding them not persuasive because they were not supported by or consistent with the record.  (D.E. 10-3 at 25-26).  However, it is unclear if the ALJ considered the opinions in the context of Charles's migraines or only in the context of the impairments the ALJ found to be severe. The ALJ's only explanation was that "[e]xams from Dr. Diaz's clinic are essentially normal" and "[x]-rays show only mild findings and treatment thus far has been conservative," which appear to be primarily applicable to Charles's degenerative disc disease and osteoarthritis.  (*Id.*).

[3] Notably, the ALJ's reliance on Charles's normal MRI results to downplay the severity of her migraines appears to be misplaced.  As the SSA has acknowledged, unremarkable MRI results are nonetheless consistent with a primary headache disorder diagnosis and such imaging is more useful for ruling out other causes for headaches, like tumors.  SSR 19-4P, 2019 WL 4169635 at *4.

to side-effects and ineffectiveness, and her treating physician's opinion of how her impairments limited her.

Moreover, although the ALJ stated that she considered all medically determinable impairments when assessing Charles's RFC, she did not discuss or analyze any nonexertional limitations that could be caused by the migraines when developing the RFC. (*See* D.E. 10-3 at 22-26). It is unclear whether the ALJ would reach a different RFC determination were she, on remand, to determine that Charles's migraines are severe and provide more detailed analysis of the associated medical records for RFC purposes. While it may be inferred that the ALJ concluded that no additional limitations were necessary in the RFC based on her finding that the migraines were non-severe, she did not actually explain this in the RFC analysis, and "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision." *Newton*, 209 F.3d at 455. Where the ALJ's opinion did not address the evidence of migraines in the context of the RFC determination, it is impossible to know whether it was overlooked or whether the ALJ properly considered and rejected it. *See Kneeland*, 850 F.3d at 762. Accordingly, this issue should be remanded for further consideration of the severity of Charles's migraines and, as necessary, whether any additional limitations should be included in the RFC determination.

## IV.    RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Charles's motion for summary judgment (D.E. 14) be **GRANTED**, the Commissioner's motion for summary

judgment (D.E. 18) be **DENIED**, and the Commissioner's denial of disability benefits be **REVERSED AND REMANDED** for further consideration.

Respectfully submitted on August 2, 2022.

_____
Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).